Filed 7/29/22 In re M.P. CA4/2

## NOT TO BE PUBLISHED IN OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FOURTH APPELLATE DISTRICT

## DIVISION TWO

|  |  |
|---|---|
| In re M.P., a Person Coming Under the Juvenile Court Law. |  |
| THE PEOPLE,  Plaintiff and Respondent,  v.  M.P.,  Defendant and Appellant. | E078295  (Super.Ct.No. INJ2000037)  OPINION |

APPEAL from the Superior Court of Riverside County.  Elizabeth Tucker, Temporary Judge.  (Pursuant to Cal. Const., art. VI, § 21.)  Affirmed.

Robert V. Vallandigham, Jr., under appointment by the Court of Appeal, for Defendant and Appellant.

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Charles C. Ragland, Senior Assistant Attorney General, and Robin Urbanski and Meredith S. White, Deputy Attorneys General, for Plaintiff and Respondent.

1

According to police reports, minor M.P. planned the robbery of a marijuana dealer. The dealer arrived in a car with two friends. The minor drew a gun and demanded their "shit." When the victims started to drive away, the minor fired seven shots, killing the dealer and wounding one of his friends.

The prosecution charged the minor with one count of murder (Pen. Code, § 187, subd. (a)) and two counts of attempted murder (Pen. Code, §§ 187, subd. (a), 664, subd. (a)). It also moved to transfer the case to adult criminal court. In the course of a four-day hearing, the juvenile court considered the oral testimony of eight witnesses, three probation officer's reports and memos, four psychological evaluations, and eleven exhibits.[1] It then issued a detailed written ruling, in which it considered the five statutory factors bearing on transfer. It concluded that three of these favored transfer; although two disfavored transfer, "based on an evaluation of all of the . . . factors and based on the totality of the circumstances as presented[,] . . . [M.P.] is not suitable for and cannot be rehabilitated within the juvenile court system . . . ." Accordingly, it granted the motion for transfer.

The minor appeals. He contends that the juvenile court's findings are not supported by substantial evidence. Not so. The minor's planning and execution of the robbery showed criminal sophistication. He continued to be active in a gang, even while in custody. The psychological evaluations indicated that he had ADHD (which made him

---

[1]     We confine our consideration to this evidence. (See *In re Zeth S.* (2003) 31 Cal.4th 396, 405.)

2

impulsive) and a conduct disorder, he lacked empathy, and he had a tendency to resort to violence in certain situations; one evaluation indicated that he was not likely to benefit from either therapy or substance abuse treatment. As the minor concedes, the charged crimes "are grave and serious." Finally, the juvenile court could reasonably discount the minor's early childhood trauma.

I

STATEMENT OF FACTS

A. *The Charged Offenses*.

On the night of July 14-15, 2020, the minor and his girlfriend, Desirae S., were at a house in Desert Hot Springs with a friend, Angel Arangure.[2] Desirae contacted a marijuana dealer and ordered $20 worth of marijuana.

The minor then told Desirae and Angel that he was going to rob the dealer. He told Desirae to walk up to the car and distract the victims. He told Angel to shine a flashlight into the car to blind or disorient them.

The dealer, Pablo Encino, arrived in a car driven by his friend Alejandro R. Their friend Bryan Lopez was sitting in the back seat. Desirae walked up to the car, asked to see the marijuana, and took out money to pay for it. As she did, Angel shone the flashlight as instructed. The minor pulled out a gun and yelled "[G]imme all your shit!"

---

[2] We give adults' first and last names and juveniles' first names and last initials. Thereafter, however, for consistency, we use first names for both.

Alejandro R. reversed out of the driveway, then accidentally shifted into neutral, rather than drive; he stepped on the gas, but the car did not move. The minor yelled, "Stop the car!" The minor then fired seven shots at the car.[3]

Pablo was hit in the back of the head and died two days later. The right side of Bryan L.'s neck or shoulder was grazed. Alejandro R. was unhurt.

A neighbor came out to see what was going on; Angel said to her, "Sorry for the noise." The minor and Angel tried to leave in Angel's car, but it would not start. Realizing that the police were coming, they went inside and pretended to be asleep.

A police officer who was in the area to investigate a different incident saw the victims' car enter the driveway of a house. Shortly afterward, he heard shots. Shortly after that, he saw the same car pull over and heard the occupants screaming. Their rear window was shattered. In the victims' car, the police found marijuana, cannabis oil, and marijuana paraphernalia.

The police went to the house where the victims had been seen entering the driveway. There were about eight people there, including the minor, Desirae, and Angel. After the neighbor told them about Angel's apology, they detained Angel and interviewed him. He denied any involvement. After the interview, however, as officers were taking him to a holding cell, he "began crying and said the shooter was [the minor]"

---

[3] The minor later told Desirae "that he 'fucked up' and that he saw the passenger reach down and he got scared and shot at the vehicle." As the probation officer noted, however, if he really shot because he was afraid, then he would hardly have yelled "Stop!" when the car started to drive away.

Police went to the minor's home and detained him and Desirae. The minor volunteered, "I'm the one you're looking for." He agreed to be interviewed but said he was asleep when the shooting occurred.

Desirae also agreed to be interviewed. At first, she, too, said she was asleep when the shooting occurred. Eventually, however, she described the crime.

The police used a pretext to place the minor and Desirae together in an interview room. Desirae whispered, "'They know you're the shooter.'" The minor whispered back, "'Shut the fuck up.'"

According to both Desirae and Angel, the minor carried a gun "on a regular basis." Eventually, Angel told the police where the gun was. They found it concealed in the air filter box of a car in his brother's garage. The serial number of the gun was missing.

B.    *Criminal History.*

On January 23, 2020, six months before the charged offenses, the police stopped a car on suspicion that it was involved in reports of "shots fired." The driver had two passengers — Angel, in the front passenger seat, and the minor, in the rear passenger seat.

In the car, the officer found two guns. The driver admitted being in possession of the semiautomatic found between the driver's seat and the center console. The other gun, a revolver under the front passenger seat, could have been in the possession of either Angel or the minor.

The driver and Angel both indicated that it was defendant who was in possession of the revolver. It was pointing backward. Given the size of the revolver, assuming the person who placed it under the seat pulled it out of his waistband first, that would mean it was the minor, in the rear seat, who put it there.

Both guns smelled as if they had been fired recently (but not necessarily that day). However, the revolver was fully loaded.

In March 2020, the minor admitted one count of possession of a loaded firearm in a vehicle (Pen. Code, § 25850, subd. (c)(6)); a charge of unlawful possession of a handgun by a minor (Pen. Code, § 29610) was dismissed. He was granted deferred entry of judgment and placed on probation.

He violated his probation by failing to perform community service, smoking marijuana, possessing a gun, continuing to associate with Angel, and ultimately by committing the charged crimes. His mother did not approve of him associating with Angel, so he lied to her about where he was going.

Between March and July 2020, however, due to the COVID-19 pandemic, juvenile probation was "closed" and most rehabilitative services were unavailable. The minor's probation officer did carry out one home visit and phoned him weekly to check up on him.

C.     *Gang Membership.*

When the minor was 14, he became involved in the "Desert Town" gang.  One of his older brothers tried to talk him out of being a gang member, but he did not listen.  Angel was a member of the same gang.

D.     *The Minor's Upbringing.*

The minor was born and raised in the Desert Hot Springs area.  He was the third oldest of nine siblings.  His father physically abused the children and their mother.  The minor's mother and father separated when he was six; his father was deported when he was eight.

When the minor was 10, his mother met a man she later married.  When she married him, they were both using methamphetamine.  As a result, the minor and his siblings were removed from the home.  He was placed in foster care, together with his two older siblings, for eight months.  Once he was returned home, he had a good relationship with both his mother and his stepfather.

Between fourth grade and either eighth or ninth grade, the minor was suspended some 10 to 15 times.

When the minor was 16, a cousin to whom he was close was accidentally shot and killed.  He felt "traumatized."

At the time of the offense, the minor lived with his mother, stepfather, siblings, and grandmother.  One sibling had been involved in a "small misdemeanor incident

7

which was later dismissed and sealed . . . ." Otherwise, none of the siblings had a criminal record or was in a gang.

E.      *Mental Health and Substance Abuse.*

The minor smoked marijuana daily. He claimed variously that he started at either 9 or 10 or at 13. He gave conflicting statements about whether he also sold marijuana.

He started drinking alcohol when he was 15. He also gave conflicting statements about how often he drank — either once a week, or once every two months.

When he was 12 or 13, he was diagnosed as having ADHD and bipolar disorder. He started taking psychotropic medications, including Adderall and/or Clonidine for ADHD and Latuda for bipolar disorder. After about two years, however, he stopped taking them, because they made him feel "weird" and he felt he no longer needed them.

Starting when he was 13 or 14, he had seizures, but these stopped after he hit his head in a fall off a bicycle.

He had auditory hallucinations (though not command hallucinations). He also reported a visual hallucination involving "dark shadows." However, he contradicted himself about when he had hallucinations and how severe they were.

F.      *Post-Arrest Conduct.*

When the minor was arrested, he had finished three years of high school and had a grade point average of 1.66. While in custody, he finished his senior year and obtained a general education diploma. He started taking junior college courses online.

While in custody, the minor was one of six inmates who fought with a single inmate; the fight may have been gang-related. Another time, he called another inmate the N-word, which resulted in a fight.

He also had some lesser disciplinary violations: possession of "many items" of contraband; three-way calling, three-way texting, and Zoom calling with unauthorized people; two refusals to meet with his behavioral therapist; tagging in his room; and using profanity to staff. Otherwise, the probation officer considered his behavior to be "near perfect."

G.    *Mental Health Evaluations.*

1.    *Dr. Jones* (*I*).

Dr. William Jones evaluated the minor in August 2020. He accepted the minor's prior diagnoses of ADHD and bipolar disorder; additionally, he diagnosed him as having PTSD. These conditions "would . . . increase impulsivity and emotional overreactivity to events around him. . . . [H]e would have an increased likelihood of engaging in self-defeating and high-risk behavior with little thought to possible consequences of his behavior to himself and others." The minor admitted "that he was impulsive and did not think about possible consequences before he acted."

In Dr. Jones's opinion, the minor "very much needs and would likely benefit from intensive psychotherapy. . . ." He "would benefit from continued psychiatric treatment with use of psychotropic medication . . . ." He also needed "an intensive substance abuse treatment program . . . ."

9

### 2. *Dr. Suiter.*

Dr. Robert Suiter evaluated the minor in October 2020.

The minor told Dr. Suiter that he bought the gun found in January 2020 "on the street." He had practiced shooting it twice, in the desert.

Dr. Suiter diagnosed the minor as having ADHD, a substance abuse disorder, and possibly a conduct disorder. "[T]he essential feature[s] of conduct disorder" are "[v]iolating the rights of others, not following the rules," and "[n]ot following societal norms." A combination of ADHD and a conduct disorder "make[s] a favorable treatment outcome more difficult."

In a test for PTSD, the minor showed a tendency to overreport; even so, the results were valid and showed no PTSD.

Testing showed heightened impulsivity. It also showed "some tendency to resort to the use of a gun and/or violence in situations where he feels he has been shamed or . . . where it would result in him feeling a sense of power and safety." In his testing responses, the minor admitted that "he broke into a house, car or building [and] he intentionally damaged a car or broke windows or things in a building . . . ."

The testing that Dr. Suiter did could not reveal whether a person is or is not amenable to treatment. He did conclude that the minor would benefit from therapy.

### 3. *Dr. Jones* (*II*).

Dr. Jones evaluated the minor again in March 2021, specifically to "assess . . . emotional trauma."

10

Dr. Jones continued to accept the prior diagnosis of bipolar disorder. However, he believed that the minor also had schizoaffective disorder. In addition, Dr. Jones's testing showed that the minor had PTSD. It indicated that the minor "externalize[d] and/or reduce[d] stress through self[-]destructive or self[-] injurious behavior and aggression . . . ."

Dr. Jones continued to believe the minor needed "intensive psychotherapy," substance abuse treatment, and possibly psychotropic medication. In his opinion, "treatment . . . could result in substantially improved functioning by age 25 or sooner . . . . He would be unlikely to present much of a risk to the safety of the community if he continues to participate in treatment and abstain from drug and alcohol usage."

#### 4. *Dr. Bosch.*

Dr. Jennifer Bosch evaluated the minor in June 2021.

The minor told Dr. Bosch that he had never bought a gun, and he was not in possession of the guns found in January 2020. As she noted, that contradicted what he had told Dr. Suiter.

She diagnosed him as having ADHD, conduct disorder and a substance abuse disorder. Bipolar disorder was also a possibility. She found no signs of psychosis. She rejected a diagnosis of either PTSD or schizoaffective disorder. A diagnosis of both ADHD and a conduct disorder tended to predict a future antisocial personality disorder.

In his testing responses, he admitted "stealing, shoplifting, lying, breaking[] or destroying property, swearing, and generally being oppositional." Testing showed that

"[a]ssaultive or aggressive acting-out behavior might be present given his report of considerable problems in controlling his anger. He may appear overly interested in violence and aggression." "He shows a pattern of disinhibition . . . that can be manifest[ed] through high risk-taking, impulsivity, and irresponsibility. He appears to be less bound by moral restraints than other people and shows callous disregard for others." He "lack[ed] empathy"; he "demonstrate[d] little or no compassion for others . . . ."

"He fears displaying weakness . . . ." Gang members view mental illness as a weakness, so being a gang member can affect the "ability to be treated."

He told Dr. Bosch that he used marijuana daily but he was not an addict. "[I]t's denial," she testified. "If a person is in denial about an addiction, it makes them less amenable to treatment." In Dr. Bosch's opinion, "he would need to address the drug and alcohol issues first . . . ." However, "he lacks insight[,] which would be important for being able to address that issue[.]" She believed the minor needed therapy, but she expected him to be resistant to it and to "have difficulty sustaining therapeutic relationships."

Recently, he was "doing well" and had "expressed a desire to make some major changes." However, she found it "hard to predict," if he was treated as a juvenile, whether he "would continue to be as motivated as he currently is . . . ." "If he should enter [placement] with this same mindset tied to a gang and gang lifestyle mentality, then the prognosis for [the minor] is poor."

H.    *Placement Options.*

If the minor stayed in the juvenile system, he could be placed in "Pathways to Success," a locked-down facility with an array of customized treatment services. However, Pathways was a brand-new program with no track record of successful rehabilitation. The minor would remain in custody for approximately six years, until his 25th birthday.

II

STATEMENT OF THE CASE

The minor was charged with one count of murder (Pen. Code, § 187, subd. (a)) and two counts of attempted murder. (Pen. Code, §§ 187, subd. (a), 664, subd. (a).) On each count, an enhancement for personally discharging a firearm and causing great bodily injury or death was alleged. (Pen. Code, § 12022.53, subd. (d).) As to the murder of Pablo, a robbery-murder special circumstance was alleged. (Pen. Code, § 190.2, subd. (a)(17)(A).) As to the attempted murder of Bryan, an enhancement for personally inflicting great bodily injury or death was also alleged. (Pen. Code, § 12022.7, subd. (a).)

The prosecution filed a motion to transfer the case to adult criminal court. (Welf. & Inst. Code, § 707, subd. (a).) After a four-day evidentiary hearing, the juvenile court granted the motion and transferred the case to adult court.

It found that two of the five prescribed statutory factors — the minor's previous delinquent history behavior and prior attempts by the juvenile court to rehabilitate him — disfavored transfer. However, it also found that the other three factors — the minor's

13

criminal sophistication, the likelihood of rehabilitation, and the circumstances and gravity of the offenses — favored transfer.

It concluded: "The court notes that recent changes in the law clearly indicate a legislative preference for keeping more juvenile offenders within the juvenile justice system. The court also recognizes that the ultimate decision on whether to grant the . . . transfer motion is not a simple balancing or counting of the various criteria and cannot be based just upon the seriousness of the current offense. The court's decision is based on an evaluation of all of the criteria and factors and based on the totality of the circumstances as presented. [¶] . . . [T]he court finds that the [People] ha[ve] met their burden of proof that [M.]P. is not suitable for and cannot be rehabilitated within the juvenile court system . . . ."

## III

## THE SUFFICIENCY OF THE EVIDENCE

As mentioned, the juvenile court found that two of the statutory factors disfavored transfer. However, it found that the other three factors favored transfer. The minor argues that the juvenile court's findings on these latter three factors is not supported by substantial evidence.

A.      *Legal Background.*

When a minor is charged with a felony committed when he or she was 16 or older, the prosecution may move to have the case transferred to adult criminal court. (Welf. & Inst. Code, § 707, subd. (a)(1).)

14

On a motion for transfer, "'[t]he prosecution bears the burden of establishing by a preponderance of the evidence [that] the minor is not a suitable candidate for treatment under the juvenile court system.' [Citation.]" (*Kevin P. v. Superior Court* (2020) 57 Cal.App.5th 173, 186.) The juvenile court must consider five statutory factors: (1) "[t]he degree of criminal sophistication exhibited by the minor"; (2) "[w]hether the minor can be rehabilitated prior to the expiration of the juvenile court's jurisdiction"; (3) "[t]he minor's previous delinquent history"; (4) the "[s]uccess of previous attempts by the juvenile court to rehabilitate the minor"; and (5) "[t]he circumstances and gravity of the offense alleged in the petition to have been committed by the minor." (Welf. & Inst. Code, § 707, subds. (a)(3)(A)-(E).) "The weight to be given each of these factors is within the court's discretion. [Citation.]" (*D.W. v. Superior Court* (2019) 43 Cal.App.5th 109, 116.)

A transfer order is immediately appealable. (Welf. & Inst. Code, § 801, subd. (a).) "We review such rulings for an abuse of discretion. [Citation.] The court's factual findings are reviewed for substantial evidence, and its legal conclusions are reviewed de novo. [Citation.] A decision based on insufficient evidence or the court's "'erroneous understanding of applicable law'" is subject to reversal. [Citation.]" (*Kevin P. v. Superior Court*, *supra*, 57 Cal.App.5th at p. 187.)

"'When a trial court's factual determination is attacked on the ground that there is no substantial evidence to sustain it, the power of an appellate court begins and ends with the determination as to whether, on the entire record, there is substantial evidence,

15

contradicted or uncontradicted, which will support the determination . . . .' [Citation.]" (*People v. Superior Court* (*Jones*) (1998) 18 Cal.4th 667, 681, italics omitted.)

B.     *The Degree of Criminal Sophistication Exhibited by the Minor.*

The criminal sophistication factor goes beyond the immediate circumstances of the crime. When evaluating a minor's criminal sophistication, "the juvenile court may give weight to any relevant factor, including, but not limited to, the minor's age, maturity, intellectual capacity, and physical, mental, and emotional health at the time of the alleged offense, the minor's impetuosity or failure to appreciate risks and consequences of criminal behavior, the effect of familial, adult, or peer pressure on the minor's actions, and the effect of the minor's family and community environment and childhood trauma on the minor's criminal sophistication." (Welf. & Inst. Code, § 707, subd. (a)(3)(A)(ii).)

The juvenile court found "that Minor's behavior indicates criminal sophistication." It explained: "This conclusion is primarily based on the Minor's access to firearms, his readiness and aptitude at using them and the planning that was done to effectuate this crime. It is significant that the Minor was over 17 and a half years of age when he committed this offense. The Minor appears to have planned this armed robbery with other individuals . . . . The robbery was thoughtfully planned out and each participant was given assigned roles to play. . . . The firearm used in this case had the serial number removed. The fact that the Minor has been able to repeatedly procure and possess illegal firearms shows a higher level of criminal sophistication as obtaining a firearm is not permitted for minors and usually not readily available. In addition, the Minor obviously

16

knows how to accurately handle and use a firearm which also supports a finding of criminal sophistication and supports the conclusion that the Minor has experience with firearms and using them. The Minor ambushed the victims in this case, taking advantage of their vulnerability and showed a high degree of callousness and malicious disregard for the lives of others."

The minor argues that "virtually any criminal charge can be characterized as involving some sort of criminal sophistication. . . . The simple nature of the drug sale robbery . . . in this case is hardly the kind of crime one can characterize as 'sophisticated.'" This ignores the juvenile court's detailed findings regarding the minor's "access to firearms," including that he managed to obtain not just one but two guns illegally, that he chose a gun with the serial number removed, and that he practiced using the gun. It further ignores the findings regarding the minor's planning. He could have committed a "simple drug sale robbery" alone; instead, he formed a team of three (including a fellow gang member older than he) and assigned roles to each. He ordered Angel to shine a light in the victims' eyes, the better to ambush them. We also note his telling Desirae to "shut the fuck up," showing that he knew the police might be eavesdropping on them.

The juvenile court discounted the effect of "the Minor's exposure to domestic violence at a young age, removal from his home by the Department of Social Services, the deportation of his biological father, the violent death of his cousin and his ADHD, PTSD and possible bipolar diagnosis." It explained that (1) "none of the Minor's many

17

siblings have had any serious interactions with the law," (2) "[a]fter Minor's return to his mother's custody, she appears to have provided a stable and healthy environment for the Minor and sought psychological treatment for him when needed and addressed his educational needs," (3) "the Minor has been able to graduate from high school while detained in juvenile hall," and (4) "[the minor] has not been prescribed psychotropic medicine during his detention."

The minor seizes on the reference to his siblings and complains that the conclusion that he was criminally sophisticated was speculative. The evidence showed, however, that the minor's siblings were generally law-abiding. The juvenile court's point was that such factors as domestic violence, the father's deportation, being removed from the mother's custody and placed in foster care, and the violent death of a cousin affected all nine children. Nevertheless, the minor was the only one who had turned to serious crime. Thus, these factors did not cut against his criminal sophistication. Moreover, the juvenile court did not consider the siblings' law-abiding nature standing alone; it also considered the mother's care for the minor, the minor's ability to complete high school, and the minor's ability to function without psychotropic medication. All of these combined indicated that his background, taken as a whole, did not reduce his sophistication.

C.      *Whether the Minor Can Be Rehabilitated Prior to the Expiration of the Juvenile Court's Jurisdiction.*

The juvenile court found that the likelihood of rehabilitation in the juvenile system favored transfer. It acknowledged that the minor had "already begun steps toward

18

rehabilitation" and could continue to be treated for up to six years at Pathways. Nevertheless, it was concerned that he had made little effort to rehabilitate after his prior offense, he was still active in a gang, and there were "anger management concerns." It added: "He has shown a reluctance to rehabilitate through his dismissal of his mother's directives not to associate with certain individuals, his brother's attempts at getting him to leave his gang lifestyle and his serious violations of his prior juvenile probation terms." Finally, it noted: "The psychological testing conducted on the Minor suggest a pessimistic outlook for effective rehabilitation."

The minor protests that this finding regarding the likelihood of rehabilitation is "grossly polluted" by the fact that rehabilitative services were not available to him after his first offense, due to the pandemic. The juvenile court, however, took this into account in finding that the fourth factor — the success of previous attempts of the juvenile court to rehabilitate the minor — disfavored transfer.

The record showed that rehabilitation was possible even during the pandemic. "[T]here were juveniles who did successfully comp1ete probation during this period." The minor's probation officer made one home visit and phoned once a week; the minor could, and on occasion did, phone him. He could have done his community service by collecting cans and bottles for recycling, but he did not.

Normal services most likely would not have prevented the minor from associating with Angel. And even had the pandemic not prevented searches, there was no way to

19

know whether a search would have actually occurred or, if a search did occur, whether the gun eventually used in the crimes would actually have been found.

After the initial four-month failure to provide services, the minor had been in custody and provided with rehabilitative services for a year and a quarter. Thus, the juvenile court could fairly take into account his continued active gang membership and his "anger management concerns" (as shown by his fighting and other disciplinary violations).

Other facts that the juvenile court considered in reaching this finding had nothing to do with the availability of rehabilitative services. The lack of rehabilitative services could not cause his reluctance to rehabilitate in the face of his mother's and brother's efforts. It likewise could not cause the results of the psychological testing.

In discussing the psychological evaluations, the juvenile court said, "The Minor is . . . exhibiting symptoms of an individual who suffers from Conduct Disorder and therefore may be difficult to treat." The minor, taking the words "may be difficult to treat" completely out of context, argues that the ruling is internally inconsistent — "a conclusion that it 'may be difficult' to rehabilitate an individual presupposes that rehabilitation is possible for that individual." However, to deny transfer, the juvenile court did not have to find that rehabilitation was impossible; it just had to find that it was so unlikely as to point toward transfer. Looking at its ruling as a whole, and not just this isolated comment regarding the minor's conduct disorder, its findings are internally consistent as well as consistent with the appropriate legal standard.

D.      *The Circumstances and Gravity of the Offense.*

Regarding the circumstances and gravity of the offenses, the juvenile court found: "The current violation is the most serious and grave allegation that exists in our society. The Minor's actions resulted in the ending of a human life. . . . [T]he Minor was intimately involved in this crime as he planned and orchestrated the robbery that resulted in the death of the decedent. This was not a spur of the moment offense. The Minor had time to think about and plan his actions. The Minor fired his gun numerous times. This crime shows extreme callousness and a certain dangerousness and disregard to human life that cannot be ignored."

The minor does not challenge this finding. He argues, however, that "this [factor] alone is not enough on its own to warrant a transfer to criminal court." He cites *Kevin P. v. Superior Court*, *supra*, 57 Cal.App.5th 173. That case, however, said "the allegation that a minor committed a serious offense, including murder, does not '*automatically* require a finding of unfitness.' [Citations.] Rather, in evaluating this criterion, a juvenile court may rely on evidence that, 'while not justifying or excusing the crime, tends to lessen its magnitude' [citation] . . . . [Citation.]" (*Id*. at p. 189, italics added.) Thus, it at least implied that, in an appropriate case, a transfer motion *may* be granted based solely on the gravity factor.

In any event, here the gravity of the offense is not the sole basis for transfer. (See parts III.B and III.C, *ante*.) The juvenile court itself acknowledged that: "[T]he ultimate decision on whether to grant the . . . transfer motion is not a simple balancing or counting

21

of the various criteria and cannot be based just upon the seriousness of the current offense."

E. *Conclusion.*

We therefore conclude that the juvenile court did not abuse its discretion by ordering the minor transferred to adult court.

IV

DISPOSITION

The order appealed from is affirmed.

NOT TO BE PUBLISHED IN OFFICIAL REPORTS

RAMIREZ
P. J.

We concur:

McKINSTER
J.

CODRINGTON
J.